UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                  :

KJ ROBERTS & COMPANY INC.,          :

                   Plaintiff,     :

                                                  :

          -against-             :

                                                    :

MDC PARTNERS INC.,                      :

                      Defendant.    :

                                                  :
------------------------------------------------------------ X

12 Civ. 5779 (LGS)

OPINION AND ORDER

LORNA G. SCHOFIELD, District Judge:

       Plaintiff K.J. Roberts & Company, Inc. brings this action against Defendant MDC

Partners, Inc. asserting claims for: (1) breach of contract; (2) breach of the implied obligation of

good faith and fair dealing; (3) unjust enrichment; (4) quantum meruit; (5) promissory estoppel;

and (6) an accounting.

       Before the Court is Defendant's motion for summary judgment dismissing Plaintiff's

Complaint in its entirety, as well as Plaintiff's motion for partial summary judgment determining

that the alleged agreement between Plaintiff and Defendant is enforceable.  For the reasons

discussed below, Defendant's motion is granted, and Plaintiff's motion is denied.

I.       **Facts**

       The following facts are drawn from the parties' submissions in connection with the instant

motions and are construed in the light most favorable to the non-moving party.

       Defendant MDC is a holding company that owns various advertising, marketing and

media agencies.  Plaintiff KJ Roberts is a company that provides consulting services through its

sole employee Kenneth Roberts.  In May 2009, Defendant contacted Plaintiff about Roberts

providing consulting services to Defendant.  In mid-June 2009, the parties orally agreed that

Plaintiff's fee would be $30,000 per month.  Following that conversation, Plaintiff began

providing services to Defendant at the agreed upon compensation rate.

On August 30, 2009, Roberts sent an email to Defendant explaining that he had reached conclusions and developed recommendations concerning Defendants' businesses and requesting a meeting to "reach an agreement on how to proceed." On October 12, 2009, Defendant sent internal emails about setting up a meeting with Roberts to "structure a deal." The parties spoke on the phone and then met in person in October 2009, when Roberts first suggested to Defendant that he would like to adjust Plaintiff's compensation to receive, in addition to the monthly fee of $30,000, a success fee based on improvement in Defendant's businesses ("Incentive Capital Payment").

From October 2009 through January 2010, the parties continued to negotiate the Incentive Capital Payment. After an in-person meeting between the parties in November 2009, at which they discussed the Incentive Capital Payment, Plaintiff decided that a handshake agreement would not suffice and retained an attorney to draft a written consulting agreement.

On January 7, 2010, Roberts sent an email to Defendant, stating, in relevant part:

On the topic of my comp—I'm a bit taken back that we're still negotiating it after six months. I thought we had a clear agreement, with the exception of finalizing the baselines for each company. We need to talk some more. I don't want you to be uncomfortable with the deal and you should fully understand, but we've shaken hands on it too many times to be trying to re-do it now.

On January 14, 2010, Roberts sent another email to Defendant, summarizing the key points that the parties had discussed concerning the Incentive Capital Payment. These points included:

- A "success fee of 25% of NOI [net operating income] improvement from agreed baselines" (the "Baseline");
- "Retainer of $30K per month—1/2 to be applied to success fee [*i.e.*, Incentive Capital Payment]";
- "Initial term of three years—cancelable at will with 30 days notice. Success fee [*i.e.*, Incentive Capital Payment] continues for 18 months after termination"; and
- The "deal completed by 1/31—simple letter of intent will be sufficient while formal

contract resolved by lawyers."

No information regarding the amount of the Baseline was included with this email.  Defendant

responded to this email the same day, stating in part that "this is as we discussed."

On January 28, 2010, Defendant sent Roberts an email stating, in relevant part, "[s]orry

this has taken so long but this is not the normal arrangement for us.  In order to come to a quick

resolution we have laid out the terms as we understand [them] and hope to meet in the middle on

the starting base at a loss of $1.5m."  This email contained an attachment titled "Proposed

Consulting Arrangement with Ken Roberts," which read, in relevant part, as follows:

1) Monthly pay equals $15k per month base pay plus $15k per month draw against the
Incentive Capital Payment
2) The Incentive Capital Payment equals 25% of trailing twelve month (TTM) Profit Before
Tax (PBT) improvements from the approved Adjusted TTM Base [the Baseline] and after
incentive bonus payments to management
   o Adjusted TTM Base [the Baseline] results equals a loss of $1.5m . . .
3) Upon termination of the agreement, eligible to receive further Incentive Capital Payments
equal to the lesser of the trailing period payment or the forward period payment.
   o The applicable period equals:
      i.   If agreement terminated within 1 year—18 months
      ii.  If the agreement terminated within 2 year—12 months
      iii. If the agreement terminated within 3 years—6 months . . .

("January Proposal").

Roberts responded to the January Proposal by email to Defendant the same day, which

stated, in relevant part, "I'm fine with the terms, with the exception of the starting baseline.  I

think the applicable loss is really $3M."  Later that same day, Roberts sent another email to

Defendant confirming that the parties, through further verbal negotiations, had agreed on a

Baseline of "a $2M loss."  This email also stated that the parties "would need to figure out a

replicable formula" to arrive at that Baseline by "agreeing on what adjustments were made,"

which Roberts stated would "be a bit tricky" because "it's one thing to negotiate a number, it will

be a little harder to come up with a consistent formula that backs into that number and can be

fairly applied (for both parties) going forward."

The "adjustments" mentioned in this email referred to non-recurring or extraordinary events, such as, but not limited to, lease termination costs, employee severance expenses, acquisition expenditures, potential insurance proceeds and tax adjustments ("Adjustments"). The categories of events that should be included as Adjustments, which were also sometimes referred to as "add backs," and what specific numbers should be associated with those events, were contested and negotiated between the parties, and were not ever completely agreed to. The Adjustments were necessary not only to determine the Baseline, but also to determine the amount of the Incentive Capital Payment.

On January 29, 2014, Roberts sent another email to Defendant, stating, "I'm glad we were able to get this done and behind us." Later that day, Defendant responded to that email, stating, "I agree." At this time, David Doft, representative of Defendant, understood that the parties had agreed to the Baseline, the percentage for the Incentive Capital Payment, and the treatment of the $30,000 retainer, "subject to a document, subject to negotiating a contract."

On February 2, 2010, Roberts and Doft met to discuss the Adjustments. At that meeting, Doft provided Roberts with a spreadsheet identifying proposed Adjustments, referred to as "add backs" and "normalizations," which were used to arrive at the Baseline of a $2 million loss and which also would be used to calculate the Incentive Capital Payment (the "Spreadsheet"). While Plaintiff agreed with some of the Adjustments on the Spreadsheet, it did not agree to all of them.

On February 15, 2010, Roberts sent an email to Defendant, stating that Plaintiff's attorney was preparing a draft of an agreement between the parties and that he would send it to Defendant for its approval. Roberts also stated, "The ball is clearly in my court at this stage." Plaintiff and its counsel subsequently drafted fifteen versions of a proposed agreement, which were privileged

and not shared with Defendant.

Four months later, on April 1, 2010, Plaintiff's attorney forwarded a draft consulting agreement to Defendant (the "April 2010 Draft"). The April 2010 Draft did not simply formalize the terms of the January Proposal, but changed and modified some terms, including the tax methodology. The April 2010 Draft was also missing some terms, including some of the terms necessary for calculating the Incentive Capital Payment.

Specifically, the April 2010 Draft stated that the "attached Schedule A" would "fully and completely identify" the Adjustments. However, Schedule A was intentionally omitted from the April 2010 Draft as Plaintiff's counsel had not yet drafted Schedule A, and Plaintiff "expected that Schedule A would be drafted after Defendant responded with comments to the [April 2010 Draft]." Defendant's general counsel reviewed the April 2010 Draft and marked it up with comments, but Defendant never shared those comments, which remained privileged, with Plaintiff.

Plaintiff does not believe that the April 2010 Draft is a "fair, accurate and complete reflection of the alleged agreement between Plaintiff and Defendant." A formal contract was never signed and executed by the parties.

On August 5, 2010, Steve Pustil, Vice Chairman for Defendant, sent an email to Roberts, which stated, in relevant part, "I understand from David [Doft] you had a discussion about our agreement. Ease rest assured we will honour our agreement." Pustil explained at his deposition that when he said "our agreement" in this email, he was referring to the January Proposal. Roberts replied to this email on August 10, 2010, stating, "[i]t was just taking a long time to get signed and I was getting a bit concerned. No need for more reassurance."

On August 13, 2010, Doft sent an email to Pustil regarding the compensation owed to

Plaintiff, explaining that because the Baseline was a loss of $2 million, the percentage of profit improvement was 25% and the year-end profit was $2.8 million, what would be owed to Plaintiff as an Incentive Capital Payment, without taking into account any Adjustments, was $1.2 million. In this same email, Doft then explained some of the "potential" Adjustments that Defendant could "argue to try to knock the number down some."

In October 2010, Defendant terminated its business relationship with Plaintiff. Subsequently, Doft spoke to Roberts concerning the compensation owed to Plaintiff. Doft testified at his deposition that at the time of this conversation, he believed that there was a "framework around compensation that had some loose ends" and that Defendant intended to compensate Plaintiff "within that framework." Doft testified that this "framework" was "a base retainer of $30,000 a month, half of which would be fixed and half would be a draw against incentive that was 25 percent of the profit improvement of the businesses."

On May 5, 2011, Doft and Roberts met to discuss Plaintiff's compensation, at which time Doft presented Roberts with calculations demonstrating that, due to Adjustments Defendant chose to apply, the Incentive Capital Payment owed was zero. Ultimately, Defendant compensated Plaintiff $30,000 per month for his work, a total of $495,000.

## II.    Summary Judgment Standard

The standard for summary judgment is well established. Summary judgment is appropriate where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the

absence of a genuine dispute as to any material fact.  Fed. R. Civ. P. 56(c); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).  The court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008).

If the non-moving party has the burden of proof on a specific issue, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim.  *See, e.g.*, *Celotex,* 477 U.S. at 322-23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  In other words, summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party carries its initial burden, then the non-moving party bears the burden of demonstrating a genuine issue of material fact.  *See, e.g.*, *id.* at 322; *Beard v. Banks*, 548 U.S. 521, 529 (2006); *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001).  The non-moving party cannot "rely merely on allegations or denials" of the factual assertions of the moving party.  Fed. R. Civ. P. 56(e)(2); *see, e.g.*, *Amaker v. Foley*, 274 F.3d 677, 680-81 (2d Cir. 2001).  Moreover, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

The non-moving party must present specific evidence in support of its contention that there is a genuine dispute as to the material facts.  *See*, *e.g., Celotex*, 477 U.S. at 324; *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998).  Furthermore, to demonstrate a genuine dispute as to

the material facts, the non-moving party must come forward with sufficient evidence to permit a reasonable jury to return a verdict in his favor. *See, e.g.*, *Anderson*, 477 U.S. at 242, 248; *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001).

**III.     Discussion**

> **A.  Breach of Contract**

Plaintiff alleges that it and Defendant entered into a binding contract regarding the Incentive Capital Payment (the "Alleged Agreement").  Plaintiff then alleges that Defendant breached this contract by not paying Plaintiff any Incentive Capital Payment.  However, Plaintiff's claim for breach of contract fails as a matter of law.

 The parties agree that New York law governs the Alleged Agreement.

> **1.  Statute of Frauds Applies to the Alleged Agreement**

As an initial matter, the Statute of Frauds applies to the Alleged Agreement.  All agreements that cannot be performed within one year are subject to the Statute of Frauds.  *See* N.Y. Gen Oblig. Law § 5-701(a)(1); *see also*, *e.g.*, *Carmon v. Soleh Boneh Ltd.*, 614 N.Y.S.2d 555, 556. (2d Dep't 1994); *Morgenweck v. Vision Capital Advisors, LLC*, 410 F. App'x 400, 402 (2d Cir. 2011).  The New York Statute of Frauds states:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
> 1.  By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime.

N.Y. Gen Oblig. Law § 5-701(a)(1).  When determining whether the Statute of Frauds applies, the "relevant question is whether the contract can conceivably be performed within one year." *Carmon*, 614 N.Y.S.2d at 556.  "The endurance of defendant's liability is the deciding factor." *Cron v. Hargro Fabrics*, 91 N.Y.2d 362, 369 (1998).

8

Here, the Alleged Agreement could not conceivably have been completed within one year.  By the terms of the Alleged Agreement, if Plaintiff's services were terminated within one year, then Plaintiff would receive further Incentive Capital Payments for eighteen months following termination ("Further Payments").  Whether Plaintiff earned these Further Payments, as well as their amounts, would depend on the performance of Defendant's businesses during the year and a half following Plaintiff's termination.

Plaintiff argues that the Statute of Frauds does not apply to the Alleged Agreement because, as Defendant concedes, the Alleged Agreement was terminable at will.  This argument fails.  Generally, where an agreement is terminable at will, it is not subject to the Statute of Frauds because it could conceivably be completed within one year.  *See*, *e.g.*, *Stucklen v. Kabro Assocs.*, 795 N.Y.S.2d 256, 257 (2d Dep't 2005).  However, here, as discussed above, the Alleged Agreement could not conceivably have been completed within one year due to the Further Payments; therefore, the Statute of Frauds applies.

Plaintiff argues that even when considering the Further Payments, the Statute of Frauds does not apply.  Plaintiff cites cases holding that certain employment contracts terminable at will were not subject to the Statute of Frauds, even where these contracts contained provisions requiring bonuses payable after the one year mark.  *See*, *e.g.*, *Cron*, 91 N.Y.2d at 366.  However, Plaintiff's cases are distinguishable from the instant case because in Plaintiff's cases, it was simply the calculation of the bonuses that needed to take place after the one year mark, as opposed to events giving rise to the earning of the bonus, which must take place after the one year mark here, as discussed below.

In *Cron*, on which Plaintiff heavily relies, the agreement at issue required the defendant to pay the plaintiff "a bonus equal to 20% of the defendant's annual pretax profits," which "could

9

not be determined 'according to usual accounting methods' until 'sixty days into the next calendar year.'"  *Id.* at 364.  The defendant argued that the Statute of Frauds "rendered the alleged oral agreement unenforceable" because the "plaintiff's claims for compensation could not be calculated within a period of one year."  *Id.*  However, the court held that the Statute of Frauds did not bar enforcement of the agreement because "the employment relationship is terminable within a year and the alleged bonus compensation required to be paid is *fixed within that period* though possibly affected by mere calculations thereafter."  *Id.* at 370 (emphasis added).

In the instant case, by contrast, more than mere calculations would need to take place after one year.  In *Cron*, the time period during which the defendant's profits were relevant to the plaintiff's bonus was during the same year that the plaintiff worked for the defendant.  Here, Defendant's businesses would need to meet certain performance benchmarks *during the year and a half following* Plaintiff's termination before the Further Payments would become earned.  The *Cron* court stressed the point that if the plaintiff had been terminated within a year, his compensation also would have been "*earned and fixed* within a year."  *Id.* at 371 (emphasis added).  Here, Plaintiff's compensation could not have been earned, much less fixed, within a year, as no determination as to whether Plaintiff would have been entitled to the Further Payments could have been made until eighteen months after Plaintiff's termination.

The instant case is more analogous to *Morgenweck*, in which the parties entered into an alleged agreement, more than a year before the launch of the defendant's hedge fund, for the defendant to pay the plaintiff a percentage of the hedge fund's annual profits, among other compensation, in exchange for the plaintiff's consulting services, which began immediately. *Morgenweck*, 410 F. App'x at 401.  The Second Circuit held that the Statute of Frauds applied to this alleged agreement because the defendant's "performance could not be completed within one

10

year of the contract's alleged creation" and because it was "impossible" that the compensation the defendant allegedly owed the plaintiff "could be earned and distributed within one year of the alleged agreement." *Id.* at 402.

Likewise, here, because Defendant's obligations would have continued for eighteen months after Plaintiff's termination, and because Plaintiff's compensation could not have been earned or determined until these eighteen months had passed, the Alleged Agreement could not conceivably have been completed by both parties within one year. Accordingly, the Alleged Agreement is subject to the Statute of Frauds.

### 2.  Alleged Agreement Fails under the Statute of Frauds

The New York Statute of Frauds requires that an agreement be "in writing, and subscribed by the party to be charged therewith." N.Y. Gen Oblig. Law § 5-701(a)(1). Additionally, "to satisfy the Statute of Frauds, the memorandum must contain substantially the whole agreement and all its material terms and conditions, so that one reading it can understand from it what the agreement is." *Kobre v. Instrument Sys. Corp.*, 387 N.Y.S.2d 617, 618-19 (1st Dep't 1976) (internal quotation marks omitted); *accord Nesbitt v. Penalver*, 835 N.Y.S.2d 426, 428 (2d Dep't. 2007). Here, there is no writing that encompasses all material terms of the Alleged Agreement; therefore, the Alleged Agreement fails under the Statute of Frauds.

Plaintiff argues that all of the parties' writings concerning the Alleged Agreement, taken together, are sufficient to satisfy the Statute of Frauds. This argument fails. While a series of writings "may be read together to satisfy the Statute of Frauds provided that they clearly refer to the same subject matter or transaction," the combination of writings still must "contain substantially the whole agreement and all its material terms and conditions." *Kobre*, 387 N.Y.S.2d at 618-19. "Even assuming that the writings viewed together constitute a memorandum

11

which demonstrates the existence of a material term orally agreed upon, but which was not recited, such omission is fatal to the contention that the writings satisfy the Statute of Frauds." *Id* at 619.

Here, even if all of the parties' writings on the subject of the Alleged Agreement are considered together, including the January Proposal, the April 2010 Draft, the Spreadsheet and the numerous emails, they still do not encompass all material terms of the Alleged Agreement. None of the parties' writings, even taken together, includes a complete formula for calculating the Incentive Capital Payment, which is the crux of the Alleged Agreement. Specifically, which Adjustments to apply to the Incentive Capital Payment, as well as what numbers to attach to those Adjustments, were never agreed to in any writing between the parties.

Plaintiff argues that the Adjustments to apply to the Incentive Capital Payment were agreed to in the Spreadsheet. However, the record belies this argument. Robert's deposition testimony states that Plaintiff did not agree to all of the Adjustments on the Spreadsheet, but only those with associated numbers. They did not include, for example, lease termination, moving costs, normalization of staff costs and compensation paid at MDC. Consistent with this, Doft's deposition testimony states that the Spreadsheet was merely an attempt at finalizing the Adjustments. Therefore, the Spreadsheet cannot qualify as a sufficient memorandum of an agreement on the Adjustments.

Plaintiff also argues that the Adjustments are not a material term of the Alleged Agreement. This argument fails because the Adjustments are crucial to the Alleged Agreement. Plaintiff concedes that the Adjustments must be applied in order to determine the amount of the Incentive Capital Payment, and the amount of the Incentive Capital Payment is the entire point and purpose of the Alleged Agreement. Without defining the Adjustments, it would be

impossible to determine how much, if any, Incentive Capital Payment Defendant would owe Plaintiff.

Moreover, the history between the parties illustrates that the decision of which Adjustments to apply and what dollar amounts to associate with those Adjustments has an enormous impact on the amount of the Incentive Capital Payment and therefore on the Alleged Agreement.  Defendant ultimately did not pay Plaintiff any Incentive Capital Payment, and its ground for this decision was that, due to the Adjustments Defendant chose to apply, the Incentive Capital Payment earned was zero.  In its calculations, Defendant used the agreed Baseline of a loss of $2 million, the agreed percentage of profit improvement of 25% and the year-end profits of $2.8 million.  Plugging these numbers into the formula without any Adjustments yielded an Incentive Capital Payment of $1.2 million.  Yet, after Defendant applied the Adjustments it unilaterally felt were appropriate, this number fell to zero.

Since the Adjustments and their related dollar amounts were never agreed to, the writings related to the Alleged Agreement left open material terms for future negotiation.  Under New York law, an agreement that leaves open material terms for future negotiation or lacks a methodology for determining the material terms violates the Statute of Frauds.  *See Carmon*, 614 N.Y.S.2d at 556 (holding that a letter of intent failed under the Statute of Frauds because it "contained open terms, called for future approval, anticipated future preparation and execution of contract documents, and was too uncertain and indefinite as to its material terms to be enforceable" and because there was "nothing in the letter of intent which provides a methodology for determining its open terms").

Because no writing or group of writings encompassing all material terms of the Alleged Agreement exists, the Statute of Frauds bars its enforcement.

13

### 3. Alleged Agreement Also Fails under New York Common Law

Even if the Statute of Frauds were not applied to the Alleged Agreement, it would still fail under New York common law.  "[I]t is rightfully well settled in the common law of contracts in [New York] that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable."  *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981); *accord Sugerman v. MCY Music World, Inc.*, 158 F. Supp. 2d 316, 324 (S.D.N.Y. 2001).

"To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999).  "If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."  *Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*, 74 N.Y.2d 475, 482 (1989); *accord Sugerman*, 158 F. Supp. 2d at 324.  Moreover, an agreement in which there is "'no way to tell from the face of the document how to establish' missing material terms . . . is unenforceable."  *Sugerman*, 158 F. Supp. 2d at 324 (quoting *Express Indus. & Terminal Corp.*, 93 N.Y.2d at 590).

As discussed above, the Alleged Agreement left open material terms for future negotiation, namely, the Adjustments to be applied in order to calculate the Incentive Capital Payment.  Leaving the method of calculation for Plaintiff's compensation, which is the core of the Alleged Agreement, open and uncertain makes the terms of the Alleged Agreement insufficiently definite for it to be enforceable under New York common law.  *See Cooper Square Realty v A.R.S. Mgt.*, 581 N.Y.S.2d 50, 51 (1st Dep't 1992) (holding that because "no objective method or formula was provided for determining" the plaintiff's compensation, which "must be

14

definite" in a service agreement, the alleged contract "was merely an agreement to agree and was unenforceable").

Plaintiff argues that the fact the methodology for calculating the Incentive Capital Payment is indefinite does not render the Alleged Agreement unenforceable.  This argument fails. "Before rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear." *Cobble Hill Nursing Home, Inc.*, 74 N.Y.2d at 483.  Specifically, "a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties." *Id.*  However, where missing or indefinite terms cannot be substituted by reference to an objective standard, the alleged agreement "leave[s] no room for legal construction or resolution of ambiguity" and therefore is unenforceable. *Joseph Martin, Jr., Delicatessen, Inc.*, 52 N.Y.2d at 111.

Plaintiff cites cases holding that certain contracts with missing terms related to compensation were enforceable where there was a reasonable basis for the court to supply a methodology by which to calculate the compensation at issue.  *See*, *e.g.*, *Knapp v. McFarland*, 344 F. Supp. 601, 611-12 (S.D.N.Y. 1971).  However, Plaintiff's cases are distinguishable from the instant case because in Plaintiff's cases, there existed either a later agreement by the parties or an objective, extrinsic standard for the court to apply.  For example, Plaintiff relies on *Knapp* for the proposition that agreements calling for an "upward adjustment" of compensation are not necessarily unenforceable simply because the formula by which to calculate the adjustment remains open.  However, there, the court held that the agreement was enforceable because "although the [agreement's] language contemplated and required further specification in order to

15

be enforceable, *the parties subsequently supplied the equivocal undefined terms*."  *Knapp*, 344 F. Supp. at 611 (emphasis added).

Here, by contrast, there is not any later agreement or any other objective, extrinsic standard for determining the Adjustments.  Adjustments, by definition, are subjective, as they are unique to the individual business and based on specific, unusual events that take place during the relevant time period.  Under New York law, in order for a court to supply an omitted contract term using "custom and usage evidence," the plaintiff "must establish that the omitted term is fixed and invariable in the industry in question."  *Hutner v. Greene*, 734 F.2d 896, 900 (2d Cir.1984) (internal quotation marks omitted) (applying New York law).  Plaintiff does not attempt to provide any relevant objective standard, much less establish a fixed standard used in the industry.

The fact that the parties never agreed on a formula for how to calculate the Incentive Capital Payment makes it clear that a meeting of the minds in regards to Plaintiff's compensation was never reached.  Consequently, Defendant's motion for summary judgment on Plaintiff's claim for breach of contract is granted.

### B.  Breach of the Implied Obligation of Good Faith and Fair Dealing

Plaintiff's claim for breach of the implied obligation of good faith and fair dealing fails as a matter of law.  "Absent the existence of a contract, a claim alleging breach of the implied covenant of good faith and fair dealing is legally unavailing."  *Keefe v. New York Law School*, 897 N.Y.S.2d 94, 95 (1st Dep't 2010); *accord G&R Moojestic Treats, Inc. v. Maggiemoo's Intern., LLC*, No. 03 Civ.10027, 2004 WL 1110423, at *8 (S.D.N.Y. May 19, 2004).  A claim for breach of the implied covenant of good faith and fair dealing "may not be used as a substitute for a nonviable claim of breach of contract."  *Sheth v. New York Life Ins. Co.*, 709 N.Y.S.2d 74, 75

16

(1st Dep't 2000).  As discussed above, Plaintiff and Defendant did not enter into a legally

enforceable contract regarding the Alleged Agreement.  Accordingly, Defendant's motion for

summary judgment on Plaintiff's claim for breach of the implied obligation of good faith and fair

dealing is granted.

### C.  Promissory Estoppel

Plaintiff's claim for promissory estoppel fails as a matter of law.  Under New York law,

"[t]he elements of a claim for promissory estoppel are: (1) a promise that is sufficiently clear and

unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the

reliance."  *MatlinPatterson ATA Holdings LLC v. Fed. Express Corp.*, 929 N.Y.S.2d 571, 577

(1st Dep't 2011).

Where promissory estoppel is invoked to "trump the Statute of Frauds," then the plaintiff

"must demonstrate 'unconscionable' injury, *i.e.*, injury beyond that which flows naturally

(expectation damages) from the non-performance of the unenforceable agreement."  *Merex A.G.*

*v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 826 (2d Cir. 1994) (applying New York law); *accord*

*Steele v. Delverde S.R.L.*, 662 N.Y.S.2d 30, 31 (1st Dep't 1997); *Carvel Corp. v. Nicolini*, 535

N.Y.S.2d 379, 381 (2d Dep't 1988); *Ginsberg v. Fairfield-Noble Corp.*, 440 N.Y.S.2d 222, 224-

25 (1st Dep't 1981); *see also Morgenweck*, 410 F. App'x at 402 n.1 ("It is well settled that under

New York law a plaintiff may not escape the Statute of Frauds by attaching the label . . .

'promissory estoppel' to the underlying contract claim.").

In accordance with the above law, Plaintiff does not argue that its claim for promissory

estoppel should survive if the Court finds that the Statute of Frauds applies to the Alleged

Agreement; instead, Plaintiff merely argues that the Statute of Frauds does not apply.   However,

as discussed above, the Statute of Frauds does apply to the Alleged Agreement.

17

Furthermore, Plaintiff does not argue or adduce any evidence from which a reasonable jury could find "unconscionable" injury or injury distinct from expectation damages.  The damages Plaintiff seeks under its theory of promissory estoppel are the same damages it seeks under its breach of contract theory, *i.e.*, expectation damages stemming from the Alleged Agreement.  "[O]ther than in the most exceptional cases, courts have consistently held that lost fees . . . constitute insufficient injury to invoke the doctrine of promissory estoppel as a bar to the assertion of a Statute of Frauds defense." *Sugerman*, 158 F. Supp. 2d at 325 (applying New York law); *accord IMG Intern. Marketing Group, Inc. v. SDS William Street, LLC*, 936 N.Y.S.2d 59 (Table), at *4 (N.Y. Sup. Ct. 2011).

Plaintiff was paid $30,000 per month for his part-time services.  Plaintiff's inability to collect the Incentive Capital Payment on top of this considerable fee, in the absence of additional evidence, cannot be viewed as unconscionable.  *See Koether v. Sherry*, 977 N.Y.S.2d 667 (Table), at *9 (N.Y. Sup. Ct. 2013) (dismissing the plaintiff's claim for promissory estoppel regarding an alleged profits sharing agreement because "[g]iven the very substantial [salary] compensation paid to plaintiff, the injury alleged here cannot be said to be unconscionable").

Moreover, whether or not the Statute of Frauds applies to the Alleged Agreement, Plaintiff cannot establish the first element of promissory estoppel, which is a clear and unambiguous promise.  As discussed above, the terms of the Alleged Agreement determining Plaintiff's compensation are indefinite and were left for future negotiation.  Without an agreement on the Adjustments, Defendant did not make a clear and unambiguous promise regarding the amount of the Incentive Capital Payment.  In addition, Plaintiff does not adduce any evidence of a promise made by Defendant other than the Alleged Agreement.  "In the absence of a duty independent of the [alleged] agreement, [a] promissory estoppel claim [is] duplicative of

[a] breach of contract claim."  *Celle v. Barclays Bank P.L.C.*, 851 N.Y.S.2d 500, 501 (1st Dep't 2008).  Therefore, Defendant's motion for summary judgment on Plaintiff's claim for promissory estoppel is granted.

### A.  Unjust Enrichment & Quantum Meruit

Plaintiff's claims for quantum meruit and unjust enrichment also fail as a matter of law. "'[A]pplying New York law, [courts] may analyze quantum meruit and unjust enrichment together as a single quasi contract claim.'"  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 n.9 (2d Cir. 2009) (quoting *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)).

"A claimant seeking relief under a theory of unjust enrichment in New York must demonstrate (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Leibowitz*, 584 F.3d at 509 (internal quotation marks omitted).  "In order to recover in quantum meruit under New York law, a claimant must establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor and (4) the reasonable value of the services."  *Id.* (internal quotation marks omitted).

However, "under New York law a plaintiff may not escape the Statute of Frauds by attaching the label 'quantum meruit' or 'unjust enrichment' . . . to the underlying contract claim." *Morgenweck*, 410 F. App'x at 402 n.1; *accord Strauss v. Fleet Mortg. Corp.*, 724 N.Y.S.2d 356 (2d Dep't 2001) (holding that "the Supreme Court properly dismissed the causes of action to recover damages in quantum meruit and for unjust enrichment" because a plaintiff "may not assert these causes of action to circumvent the Statute of Frauds"); *Am.-Eur. Art Assoc. v Trend*

*Galleries*, 641 N.Y.S.2d 835, 836 (1st Dep't 1996) ("plaintiffs may not utilize a quantum meruit theory of recovery to circumvent the Statute of Frauds").

Here, as discussed above, the Statute of Frauds applies to the Alleged Agreement; therefore, Plaintiff cannot use a theory of quantum meruit or unjust enrichment to escape it. Consequently, Defendant's motion for summary judgment on Plaintiff's claims for quantum meruit and unjust enrichment is granted.

### B.   Accounting

Finally, Plaintiff's claim for an accounting fails as a matter of law. "In order to sustain an equitable action for accounting under New York law, a plaintiff must show either a fiduciary or confidential relationship with the defendant." *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir. 1996); *accord Palazzo v. Palazzo*, 503 N.Y.S.2d 381, 384 (1st Dep't 1986). Plaintiff argues that a confidential relationship between it and Defendant exists. This argument fails. Under New York law, a "confidential relationship" in this context refers to a relationship "which induced plaintiff to entrust defendant with property or money." *Beck v. CIT Group/Credit Fin., Inc.*, No. 95 Civ. 5800, 1998 WL 655547, at *4 (S.D.N.Y. Sept. 24, 1998) (applying New York law); *accord Kastle v. Steibel*, 502 N.Y.S.2d 583, 539 (3d Dep't 1986). Plaintiff has not produced any evidence suggesting that it entrusted Defendant with property or money or that its relationship with Defendant consisted of anything other than arm's length business dealings. Accordingly, Defendant's motion for summary judgment on Plaintiff's claim for an accounting is granted.

### IV.   Conclusion

For the reasons discussed above, Plaintiff's motion for partial summary judgment is hereby DENIED, and Defendants' motion for summary judgment dismissing Plaintiff's

complaint in its entirety is hereby GRANTED.

The Clerk of Court is directed to close the motions at docket numbers 43 and 50 and to close this case.

SO ORDERED

Dated: March 14, 2014
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

21